PER CURIAM.
A.E. (“the maternal aunt”) and J.E. (“the maternal uncle”) (hereinafter together referred to as “the maternal aunt and uncle”) appeal a determination that their niece, T.L.S. (“the child”), is not dependent and the award of custody of the child to the child’s father, M.C. (“the father”).
The child’s mother, J.L.S. (“the mother”), and the father never married. A February 5, 2005, judgment of the Marshall Juvenile Court, in case number CS-04-200172, adjudicated the father’s paternity and ordered him to pay child support.
On June 7, 2006, the mother died; the child was two years old at that time. According to allegations in the record, shortly after the mother’s death, S.K.P. (“the maternal grandmother”) and R.S. (“the maternal grandfather”) filed a petition in the Etowah Juvenile Court seeking to have the child declared dependent. On August 4, 2006, the Etowah Juvenile Court entered an order (hereinafter the “August 4, 2006, dependency order”) finding the child to be dependent and awarding pendente lite custody of the child to the maternal grandmother.[1] A handwritten notation on the August 4, 2006, dependency order states that the dependency petition and order were to be served on the father.
Within a few months of receiving custody of the child pursuant to the August 4, 2006, dependency order, the maternal grandmother transferred physical custody of the child to the maternal aunt and uncle. The maternal aunt and uncle did not seek or obtain a court order awarding them custody of the child. However, the child remained in the home of the maternal aunt and uncle until the entry of the July 2011 judgment in the underlying actions.
On October 14, 2010, the father filed a petition in the “Unified Family Court” of Marshall County; the action initiated by that petition was designated as case number DR-10-882. In his petition, the father sought an award of legal and physical custody of the child. The father named the mother, whom he identified in that petition as having been deceased for more than four years, as the sole defendant; the father named the maternal grandmother as a “potential intervenor” in case number DR-10-882 (hereinafter sometimes referred to as “the father’s custody action”).[2] *590 The trial court in that action entered an order specifying that the father’s petition be served on the maternal grandmother.
On November 18, 2010, the maternal aunt and uncle filed in the Marshall Juvenile Court a petition seeking to have the child declared dependent and seeking an award of custody of the child. The action initiated by the maternal aunt and uncle’s dependency petition was designated as case number JU-10-300302.01 and is hereinafter sometimes referred to in this opinion as “the dependency action” or “the maternal aunt and uncle’s dependency action.” In their dependency petition, the maternal aunt and uncle alleged that the maternal grandmother had relinquished physical custody to them in 2006, shortly after the mother’s death, and that the child had resided continuously in their home since that time; they also alleged that the father had voluntarily relinquished custody of the child to them. The maternal aunt and uncle later amended their dependency petition to allege that the child was dependent because, they argued, the father had abandoned the child. In their amended dependency petition, the maternal aunt and uncle sought the termination of the father’s parental rights. At the trial of this matter, the maternal aunt and uncle withdrew their claim seeking the termination of the father’s parental rights, but they continued to assert, in conformity with their amended dependency petition, that the father’s actions constituted an abandonment of the child.
We note that this court’s clerk verified that in Marshall County a domestic-relations action such as the father’s custody action is within the jurisdiction of that county’s circuit court.[3] The maternal aunt and uncle’s dependency petition invoked the jurisdiction of the juvenile court. Pursuant to § 12-17-24.1, Ala.Code 1975, Marshall County has created a family-court division that it has titled the “Unified Family Court,” which handles family-related actions arising under the jurisdiction of both the juvenile court and the circuit court. The record indicates that case number JU-10-300302.01 and case number DR-10-882 were each assigned to and considered by the same trial judge, apparently sitting in his capacity as a judge for the unified system in that county. Accordingly, this court will refer to the actions of the court below, whether in case number JU-10-300302.01 or in case number DR-10-882, as having been taken by “the trial court.”
After the maternal aunt and uncle filed their dependency petition, the maternal grandmother filed a motion to dismiss in case number DR-10-882, the father’s custody action. The trial court did not expressly rule on the maternal grandmother’s motion to dismiss, but on December 8, 2010, it entered an order setting the matter, together with the maternal aunt and uncle’s dependency action (case number JU-10-300302.01), for a hearing. The trial *591 court entered an order later in December 2010, awarding the father certain visitation with the child.
On January 7, 2011, the maternal aunt and uncle filed a motion in the father’s custody action seeking to “consolidate” that action with their dependency action. The father filed in his custody action a notice of his “consent” to the consolidation of the two actions. The trial court did not enter an order specifically granting the consolidation, and, because the two actions invoked the jurisdiction of different courts, it does not appear that consolidation would have been appropriate in this case. The trial court did conduct a joint ore tenus hearing for the two actions. We note that at the ore tenus hearing the maternal grandmother informed the trial court that she did not want to be a party to the father’s custody action because she was not seeking an award of custody of the child.
On July 22, 2011, the trial court entered a judgment denying the maternal aunt and uncle’s dependency petition and ordering that case number JU-10-B00302.01 be closed. Also on July 22, 2010, the trial court entered in case number DR-10-882 a judgment awarding custody of the child to the father. On August 5, 2011, the maternal aunt and uncle filed a postjudgment motion; the style of that motion indicated that it was filed with regard to both case number DR-10-882 and case number JU-10-300302.01. The trial court did not rule on the postjudgment motion, and on September 1, 2011, the maternal aunt and uncle filed a separate notice of appeal to this court in each case.
Much of the testimony from the transcript of the hearing concerns the details of the father’s relationship with the mother and various details about the father’s interactions with the mother, the maternal grandmother, the maternal aunt and uncle, or the child. This opinion summarizes the relevant portions of that evidence as follows.
The child was born in April 2004. The witnesses explained that the mother and the child had lived with the maternal grandmother and the maternal grandfather from the time the child was born until the mother’s death in June 2006. The father admitted that he had been invited to but had not been present at, the birth of the child. It is undisputed that, before the mother’s June 2006 death, the father had had brief contact with the child only a few times at the instigation of the mother; one of those of occasions was at the genetic testing that resulted in the February 5, 2005, paternity judgment.
The father attended the mother’s funeral and memorial service in June 2006, and he saw the child during those events. The father also testified that, in the weeks following the mother’s death, he visited the child approximately five more times at what he characterized as the maternal grandfather’s home.[4]
The maternal grandmother testified that the child remained in her physical custody following the mother’s death and that the father did not request, or attempt to take, custody of the child. The maternal grandmother and the child moved to another county, and the maternal grandmother obtained pendente lite custody of the child pursuant to the August 4, 2006, dependency order. However, it is undisputed that, within a few months of the entry of that order, the maternal grandmother gave physical custody of the child to the maternal aunt and uncle.
*592 The father admitted that, aside from the visits with the child he had had in the month or so following the mother’s death, he did not visit the child for the remainder of 2006. The father also admitted that he did not see the child at all in 2007 and 2008 and that he had not requested visitation with the child during those years. The father testified that he did not visit the child in 2008 because the maternal grandmother had initiated a criminal action against him, alleging he had vandalized her vehicle; the father testified that he appealed his district-court conviction on that charge to the circuit court and was acquitted.
The father testified that, at the maternal aunt’s invitation, he attended the party for the child’s fifth birthday in April 2009. Shortly thereafter, the father met the maternal uncle for lunch to discuss the child. The maternal uncle testified that he had encouraged the father to visit the child and that he had invited the father to one of the child’s athletic events. The father testified that he could not recall any of the details of that conversation, but he characterized it as “cordial.” It is undisputed, however, that the father did not attend the April 2009 athletic event to which the maternal uncle had invited him. After seeing the child at the April 2009 party, the father did not visit the child again in 2009, and he had no contact with the child in 2010 before he initiated his custody action in case number DR-10-882 in October 2010. The father first began regularly visiting the child pursuant to a court order entered in December 2010.
The father testified on direct examination that in the four years between the mother’s June 2006 death and October 2010, when he filed his custody petition, he had asked for and been refused visitation on seven occasions. However, on cross-examination, the father could recall only one instance in which he telephoned the maternal aunt and uncle and was refused visitation. The father stated that he had requested visitation on one occasion after the April 2009 meeting with the maternal uncle but that he had not been allowed to visit the child. The maternal uncle testified that, on that occasion, the father had telephoned “midweek” and had requested a visit with the child for the upcoming weekend. The maternal uncle testified that he had explained to the father that he and the maternal aunt were taking the child out of town that weekend and that he had told the father to call back regarding another time for a possible visit. The father confirmed that the maternal uncle had explained the plans to be out of town and had asked him to call again, but the father could testify to no other occasion in which he had again requested visitation with the child. We note that, although the maternal aunt and uncle testified that they had attempted to encourage the father to visit or have contact with the child, the father testified that he could not recall their having done so.
The maternal aunt testified that, to her knowledge, the father had had contact or visited with the child only 12 times in the 6½ years between the child’s birth and the date on which the father filed his custody petition. The father disputed that testimony, pointing to additional visits he and the maternal grandfather testified he had had in the month following the mother’s death in 2006; the maternal aunt stated that she had not been aware of those visits.
Dr. David R. Wilson, a licensed psychologist, evaluated the child, the maternal aunt and uncle, the father, and the father’s wife, S.L.C. In short, Dr. Wilson testified that the maternal aunt and uncle were honest, credible, and psychologically healthy. Dr. Wilson testified that the ma *593 ternal aunt and uncle were and would be excellent parents to the child. Dr.. Wilson testified that the child was very bonded with the maternal aunt and uncle as parent figures.
Dr. Wilson testified that the results of the testing during his evaluation of the father caused him concern because the validity indicators for those tests revealed that the father had attempted to present himself in a better light. Dr. Wilson testified that, although such behavior is not unusual in custody cases, the behavior suggested that the father would have difficulty admitting or acknowledging problems he had. Dr. Wilson testified that, when he asked the father why he was seeking custody of the child, the father responded that the child was his child, that the child was his responsibility, and that, although he had missed the child’s first six years, he wanted to make it up to her; Dr. Wilson testified that the father had not said to him that he loved the child.
Dr. Wilson testified that he had talked with the child shortly after the father initiated his custody action and had been granted some visitation with the child. Dr. Wilson stated that the child was anxious about visiting the father. He also believed that a change in custody could be emotionally traumatic for the child and could affect her ability to form relationships in the future. On cross-examination by the father, Dr. Wilson testified that he had not seen any adverse psychological effects to the child from her change in custody from the maternal grandmother to the maternal aunt and uncle following the mother’s death.
The father testified at the hearing in this matter that he had begun working in the insurance business in 2007 and that he had been employed by the same employer for the last three years. The father testified that he had been married for two years and that he attended church regularly. The father testified that he had not attempted to visit the child or seek custody of her earlier because he was young; he stated that he believed that he became mature enough to handle the situation at approximately the same time he entered the insurance industry.
The father also testified that he had consistently paid child support. The record indicates that, at some point in 2006, the maternal grandmother began receiving those child-support payments. An order entered by the trial court during the pen-dency of this matter required the maternal grandmother to deposit the child support she received into a savings account for the child. It is not clear from the record on appeal whether, before the entry of that order, the maternal grandmother had been saving the child support for the child. Regardless, the record demonstrates that, although the father was paying child support as ordered, the maternal aunt and uncle had not received any of the father’s child-support payments during the years the child was in their physical custody.
The maternal aunt and uncle testified that they had raised the child since shortly after the death of the mother. They testified that they love the child and have treated her as their own child; the child refers to the maternal aunt and the maternal uncle as “Mommy” and “Dad,” respectively. The maternal aunt and uncle also testified that they are each employed, that their home is adequate for the child, that they attend church regularly, and that the child is involved in extracurricular activities.
The father began visiting the child regularly after a December 2010 order of the trial court awarded him visitation with the child during the pendency of this matter. The father testified that he loves the child and that she is happy in his home. On *594 questioning from the maternal aunt and uncle, the father denied forcing the child to refer to him as her father, and he denied preventing the child from calling the maternal aunt and uncle or from using a cellular telephone provided by the maternal aunt and uncle for that purpose.
The child also testified at the hearing. She stated that the father makes her call him “Poppy.” The evidence indicated that the maternal aunt and uncle gave the child a cellular telephone so that she could contact them when she visited the father. The child testified that during visitations the father or his wife sometimes put that cellular telephone in a place where she cannot access it. The child indicated that she wanted to live with the maternal aunt and uncle and visit the father.
On appeal, the maternal aunt and uncle argue that the juvenile court erred in failing to find the child dependent and in awarding custody of the child to the father. In response, the father contends that, although the maternal aunt and uncle properly appealed the judgment denying their dependency petition in case number JU-10-300302.01, they do not have standing to challenge the “custody judgment” entered in case number DR-10-882. The father argues that the maternal aunt and uncle were not parties to case number DR-10-882 and, therefore, that they cannot appeal the judgment entered in that action. As is explained below, we do not reach the father’s argument because we resolve this issue on a different basis.
The February 5, 2005, judgment that established the father’s paternity of the child and ordered him to pay child support also constituted an award of custody of the child to the mother. Ex parte L.N.K., 64 So.3d 656, 656 (Ala.Civ.App.2010); M.R.J. v. D.R.B., 17 So.3d 683, 686-87 (Ala.Civ.App.2009); and T.B. v. C.D.L., 910 So.2d 794, 795-96 (Ala.Civ.App.2005). Upon the mother’s death, custody of the child did not automatically vest in the father. However, the father is correct that, upon the mother’s death in 2006, he had a prima facie right to custody of the child. M.H. v. 70 So.3d 398, 406 (Ala.Civ.App.2011); Newman v. Newman, 667 So.2d 1362, 1365 (Ala.Civ.App.1994); see also Ex parte D.J., 645 So.2d 303 (Ala.1994); and Daniels v. Trawick, 232 Ala. 466, 168 So. 551 (1936). We note that that prima facie presumption in favor of the parent does not apply when the parent is determined to be unfit or when he or she has voluntarily relinquished custody of the child to a nonparent. Ex parte G.C., 924 So.2d 651, 656 (Ala.2005); Ex parte S.T.S., 806 So.2d 336 (Ala.2001); and Ragsdale v. Ragsdale, 991 So.2d 770, 772 (Ala.Civ.App.2008).
In this case, the father did not assert his prima facie right to custody and seek custody of the child in 2006 following the death of the mother. Rather, more than four years after the mother’s death, the father initiated a new action seeking custody of the child by filing his petition in case number DR-10-882. In case number DR-10-882, the father named the mother as the only defendant, and he stated in that custody petition the mother had died more than four years earlier. Thus, the sole defendant named by the father in his custody petition was deceased.[5] A de- *595 ceased person lacks the capacity to be sued in an action such as the one initiated by the father, and, therefore, we conclude that the father, in asserting his custody claim in case number DR-10-882, failed to invoke the subject-matter jurisdiction of the trial court. See 67A C.J.S. Parties § 54 (2002) (“The capacity to be sued exists only in persons in being and so, does not exist in the case of persons deceased, and a suit filed against a dead person does not invoke the jurisdiction of the court.” (footnotes omitted)). We adopt the explanation of the Superior Court of Connecticut, which stated:
“ ‘By its very terms, an action at law implies the existence of legal parties; they may be natural or artificial persons, but they must be entities which the law recognizes as competent.’ Thompson v. Peck, 320 Pa. 27, 30, 181 A. 597 (1935). Corkin, the person named in the writ as the defendant in this case, was dead at the time of service. No such person existed at that time. The first count of the complaint is thus an action against nobody. Bateman v. Wood, 297 Mass. 483, 485, 9 N.E.2d 375 (1937). ‘[A] dead person is a nonexistent entity and cannot be a party to a suit. Therefore, proceedings instituted against an individual who is deceased at the time of the filing of suit are a nullity. Such proceedings are void ab initio and do not invoke the jurisdiction of the trial court.’ Volkmar v. State Farm Mutual Automobile Ins. Co., 104 Ill.App.3d 149, 151, 60 Ill.Dec. 250, 432 N.E.2d 1149 (1982); accord Richie v. Laususe, 892 S.W.2d 746, 748 (Mo.Ct.App.1994).”
Noble v. Corkin, 45 Conn.Supp. 330, 332-33, 717 A.2d 301, 302-03 (1998).[6]
Given the foregoing, we conclude that the father’s custody action in case number DR-10-882 was void at its inception because the sole named defendant was a deceased person who lacked the capacity to be sued in a custody action. Therefore, the trial court never obtained subject-matter jurisdiction over the father’s custody claim in case number DR-10-882.[7] “The absence of subject-matter jurisdiction renders void any judgment entered in the action.” Moore v. John Hancock Life Ins. Co., 876 So.2d 443, 448 (Ala.2003). Further, an appellate court may notice an absence of subject-matter jurisdiction ex *596 mero motu. Riley v. Hughes, 17 So.3d 643, 648 (Ala.2009). We hold that the judgment in case number DR-10-882 is void for want of subject-matter jurisdiction, and we dismiss the appeal from that judgment. Owens v. Owens, 51 So.3d 364, 367 (Ala.Civ.App.2010). For that reason, we have elected not to address the merits of the father’s argument that the maternal aunt and uncle lacked standing to appeal the void judgment entered in case number DR-10-882.
We next turn to the maternal aunt and uncle’s arguments that the trial court erred in concluding that the child was not dependent. The maternal aunt and uncle contend that they presented clear and convincing evidence demonstrating that, in the four years after the mother’s death, the father had abandoned the child and had left her to be raised by others. See T.B. v. T.H., 30 So.3d 429, 432 (Ala.Civ.App.2009) (“[Ajllegations of dependency must be proven by clear and convincing evidence.”); see also § 12-15-310(b), Ala.Code 1975 (requiring dependency allegations to be proven by clear and convincing evidence).
“A child is dependent if, at the time a petition is filed in the juvenile court alleging dependency, the child meets the statutory definition of a dependent child.” Ex parte L.E.O., 61 So.3d 1042, 1046 (Ala.2010). The definition of “dependent child” is set forth in § 12-15-102(8)(a), Ala.Code 1975; that section defines the term “dependent child” to include a child
“who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
[[Image here]]
“5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in subdivision (1) of Section 12-15-301.”
Section 12-15-301(1), Ala.Code 1975, defines that “abandonment” as:
“A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
In Ex parte L.E.O., supra, the child had resided for three years with the petitioners ■with the mother’s permission; the petitioners were not related to the child. The petitioners sought to have the child declared dependent and to be awarded custody of the child. At the time the petitioners filed their dependency petition, the child’s father, who had been living in California, had not seen the child for more than three years. The father testified that he had had no idea the mother had relinquished custody of the child to the petitioners and that the mother had thwarted his efforts to visit the child. The juvenile court determined that the child was not dependent, and this court affirmed the juvenile court’s judgment without an opinion. L.E.O. v. A.L., 61 So.3d 1041 (Ala.Civ.App.2009). Our supreme court reversed, holding that the evidence clearly established that the father had abandoned the child and, therefore, that the child was dependent. Ex parte L.E.O., supra.
In so holding, our supreme court stated that when a child meets one of the criteria under the definition of a “dependent child,” including abandonment, the juvenile court must also determine whether the child is “in need of care or supervision.” Ex parte L.E.O., 61 So.3d at 1047; see also § 12-15-102(8)(a), Ala.Code 1975 (A “dependent child” is one “who has been adjudicated dependent by a juvenile court and is in *597 need of care or supervision and meets any of the following circumstances: .... ” (emphasis added)). The supreme court declared that “[i]t is a reasonable interpretation of [the predecessor to § 12-15-102(8)] to require that, in determining whether a child is ‘in need of care or supervision,’ the juvenile court must consider whether the child is receiving adequate care and supervision from those persons legally obligated to care for and/or to supervise the child.” Ex parte L.E.O., 61 So.3d at 1047. In Ex parte L.E.O., supra, our supreme court noted that the father had merely assumed without verifying that the mother had adequately cared for the child for more than three years, that he had failed to ensure that the child had basic essentials, and that he had failed to contribute to the support of the child. Accordingly, the court concluded that, “at the time the petitioners sought custody of the child and a finding of dependency, the child had been abandoned by both persons legally obligated to care for and/or supervise him.” Id. at 1050.
We note that the maternal aunt and uncle cite J.S.M. v. P.J., 902 So.2d 89 (Ala.Civ.App.2004), in support of their contention that the child was dependent.[8] In that case, the father of the 14-year-old child at issue had left the child in the care of the petitioner, a nonrelative, for most of the child’s life. The father had paid child support to the petitioner, but his visitation with the child was sporadic. During one of those visitations, the father refused to allow the child to return to the petitioner’s home; the child was residing with the father at the time of the dependency hearing. The juvenile court found the child to be dependent, and this court affirmed the dependency judgment, noting that the father had paid some support for the child and had visited the child only sporadically and that the child had a strong emotional bond to the petitioner as a result of having lived with her for the vast majority of his life. J.S.M. v. P.J., 902 So.2d at 96.
In this case, even assuming that the father saw the child in 2006 as much as he claimed at trial, i.e., approximately 10 times in the month or so following the mother’s death, it is undisputed that the father had no further contact with the child in 2006. The father admitted that he did not have any contact with the child in 2007 or 2008. The father had one visit with the child in 2009, when he attended her birthday party. After that visit, the father made one request for visitation with the child, and the maternal uncle explained that the family was to be out of town at the time of that proposed visit. The father did not attempt to reschedule that proposed visit, made no attempt to see the child again, and did not see the child again before filing his custody petition in October 2010. The maternal aunt and uncle filed their dependency action one month later, contending that the father’s conduct during the child’s life before filing that petition constituted an abandonment of the child.
*598 The father, in arguing that the facts in Ex parte L.E.O., supra, are distinguishable from the facts of this case, has emphasized that, unlike the father in Ex parte L.E.O., he has contributed to the support of the child.[9] However, the father in J.S.M. v. P.J., supra, also left his child in the custody of others for years, and the fact that he had paid child support was not held to negate the dependency of the child.
Further, the statutory definition of abandonment specifies that a parent abandons a child when he or she “withhold[s] from the child, without good cause or excuse, ... his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.” § 12-15-301(1). Although “maintenance,” i.e., support, is one of many factors to consider in determining whether a parent has abandoned a child, it is clear that failing to be present and act as a parent is equally significant. The father does not contend that there is any evidence indicating that he served any parental role to the child in the four years between the death of the mother and the time he filed his petition for custody of the child. Other than his testimony that he loved the child, there is no evidence indicating that, after the mother’s death, the child enjoyed the presence, care, protection, or filial affection of the father, or that the father claimed the rights or performed the duties of a parent. See § 12-15-301(1).
The father contends in his brief submitted to this court that his current circumstances do not support a determination that the child is dependent. In making that argument, the father cites his current circumstances, maintains that he is now willing and able to properly care for the child, and insists that a child’s dependency should be determined at the time of the dependency hearing. At the time of the entry of the July 22, 2011, judgment in the dependency action, the father had abandoned the child to the care of others for more than four years. The father’s filing a custody action and, as part of that action, obtaining visitation with the child did not negate his abandonment of the child. See Ex parte J.W.B., 933 So.2d 1081, 1092 (Ala.2005) (‘“We should not equate the filing of “court papers” and the taking of legal positions with the establishment of human relationships.’” (quoting K.W.J. v. J.W.B., 933 So.2d 1075, 1081 (Ala.Civ.App.2005) (Murdock, J., dissenting))). Further, we decline to hold that the father’s regular exercise of that court-ordered visitation for approximately seven months before the final hearing in any way diminished the effects of his abandonment of the child. The testimony of Dr. Wilson was that, as a result of the father’s abandonment, the child considered the maternal aunt and uncle to be her parents and that a transfer of custody away from them could have a damaging effect on the child. The child’s testimony at the final hearing supported those statements. We cannot conclude that, under these facts, the father’s stated willingness to appear in the child’s life and serve in a parental role diminished or erased his abandonment of her for the vast majority of her life.
Further, we note that the mother in J.W. v. N.K.M., 999 So.2d 526 (Ala.Civ.App.2008), made an argument similar to the father’s, i.e., that her circumstances at the time of the hearing and judgment did not support a determination that the child at issue in that case was dependent. In *599 making that argument, the mother in J.W. v. N.K.M., supra, cited cases in which this court had emphasized a parent’s current situation in termination-of-parental-rights cases. This court rejected the argument in that case, stating:
“In those cases, however, the evidence indicated that the parents had altered the circumstances of their lives to enable them to be more stable or appropriate parents. The evidence in this case supports a finding that the mother’s current circumstances are similar to her circumstances during the periods in which she elected to leave the child with relatives rather than provide a home for the child herself”
999 So.2d at 538 (emphasis added).
Similarly, in this case, the evidence demonstrates that the father’s circumstances at the time of the trial were the same as those during the years following the mother’s death, when he failed to meet his parental responsibilities to the child. The father testified that he believed he became mature enough to “handle this,” i.e., to assume custody of the child, at the same time he first started working in the insurance business, which he stated was in 2007. However, the father admitted he did not see the child during 2007 or 2008 and that he visited her only once during 2009. The father married his current wife in August 2009, and in November 2009 the father and his wife purchased a home. Approximately one year later, and without having attempted to make contact with the child or the maternal aunt and uncle, the father filed his October 2010 custody petition.
We note that the father has contended that his youth and lack of maturity prevented him from assuming custody of the child earlier. However, the maternal aunt and uncle are only two and three years older, respectively, than the father. Thus, the maternal aunt and uncle were quite young themselves when they took physical custody of the child and began providing a home and caring for the child. In fact, at the time the maternal aunt and uncle stepped in to meet what should have been the father’s parental responsibilities, they were both younger than was the father at the time he filed his petition for custody of the child.
Like the father in J.S.M. v. P.J., supra, the father in this case, although he contributed to the child’s support, left the child to be cared for by others for years. We recognize that a finding of dependency must be supported by clear and convincing evidence and that a determination whether a child is dependent is within the discretion of the trial court. Ex parte L.E.O., 61 So.3d at 1048; J.S.M. v. P.J., 902 So.2d at 95. However, we conclude the facts of this case are similar to those of Ex parte L.E.O., supra, in that “no credible evidence supports the [trial] court’s conclusion” that the child was not dependent as a result of the father’s abandoning her. Ex parte L.E.O., 61 So.3d at 1048.
We conclude that the trial court erred in failing to find the child dependent because of the father’s abandonment of the child. We therefore reverse the judgment in case number JU-10-300302.01 and remand the cause for the trial court to enter a judgment in conformity with this opinion.[10] The appeal of the judgment in case number DR-10-882 is dismissed.
2101154 — APPEAL DISMISSED.
2101173 — REVERSED AND REMANDED.
*600 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, with writing.

. There is no indication in the record that the maternal grandfather was awarded pendente lite custody of the child or that he has been involved as a party to any other actions pertaining to the child.

. In his custody petition, the father alleged that he had been adjudicated the father of the child in 2005 and had paid support for the child pursuant to the 2005 judgment. The father further alleged that the mother had died in 2006 and that the child had been *590 residing since 2006 in the physical custody of the maternal grandmother or the maternal aunt and uncle.

. Under the current Alabama Juvenile Justice Act ("the AJJA”), § 12-15-101 et seq., Ala. Code 1975, if a child whose paternity has been established by a judgment of the juvenile court has not been determined to be dependent, the juvenile court does not retain continuing jurisdiction over the child, and any custody-modification action involving the child must be brought in the circuit court. D.C.S. v. L.B., 84 So.3d 954, 957 (Ala.Civ.App.2011). Therefore, we conclude that, under the current version of the AJJA, the father, who was apparently not served in the dependency proceeding initiated by the maternal grandmother, properly initiated his action seeking an award of custody of the child by invoking the circuit-court jurisdiction of the Marshall Unified Family Court.

. Either shortly before or at approximately the same time as the mother’s death, the maternal grandmother and the maternal grandfather divorced.

. The father asserts in his brief on appeal that the maternal grandmother had "standing” to challenge the custody judgment entered in case number DR-10-882. The father did not name the maternal grandmother as a defendant to his custody action. Rather, in his custody petition, the father identified the maternal grandmother as a "potential interve-nor” in the custody action, and he asked that the trial court "allow such parties as may desire to hire attorneys and intervene as the Court may deem appropriate under Alabama *595 law.” Although the trial court ordered that the maternal grandmother be served with the father's custody petition, there is no indication in the record on appeal that the maternal grandmother was joined as a defendant or party to the father’s custody action. The maternal grandmother did not move to intervene in the father's custody action. At the hearing in this matter, the maternal grandmother informed the trial court that she did not wish to assert a claim seeking custody of the child. Accordingly, given these facts and the record on appeal, we conclude that the maternal grandmother was not a party to either action below, and it is clear that she is not a party before this court.

. We note that some authority from other jurisdictions has determined that a lack of capacity to be sued does not affect a court’s subject-matter jurisdiction. Currier v. Sutherland, 218 P.3d 709, 712-13 (Colo.2009), and cases cited therein. Those cases are distinguishable, however, because the tort or contract claims asserted in those cases could be maintained against a different entity or a representative or estate of the named defendant. In this case, the custody claim asserted by the father could not be asserted against a representative of the mother or against the mother’s estate. In resolving this appeal, we have considered only the custody claim at issue in case number DR-10-882, and we confine the holding of this case to the facts of this case.

. We further note that even if the trial court had attempted to add the maternal grandmother as a defendant to the father’s custody action after it ordered that she be served with the father’s custody petition, such an attempt would have had no effect because the father's custody action was void ab initio.

. In their brief on appeal, in addition to other authority, the maternal aunt and uncle cite cases addressing whether a parent loses his or her prima facie right to custody of a child in a custody action if the evidence demonstrates that the parent voluntarily relinquished custody of the child to a nonparent. See Ex parte G.C., supra (a custody case in which a majority of our supreme court held that the father had voluntarily relinquished custody of the child and, therefore, had lost his prima facie right to custody of the child); T.T.T. v. R.H., 999 So.2d 544 (Ala.Civ.App.2008) (same). Although there are similarities between the concepts of abandonment and a voluntary relinquishment of custody, see, e.g., T.S. v. E.J., 976 So.2d 497 (Ala.Civ.App.2007), in this opinion we have confined our analysis to that part of the maternal aunt and uncle’s argument pertaining to the issue of abandonment.

. As indicated earlier in this opinion, for reasons not made clear in the record on appeal, the maternal aunt and uncle did not receive the child-support payments made by the father.

. Because we are reversing the judgment denying the maternal aunt and uncle's dependency petition, we pretermit discussion of the maternal aunt and uncle’s argument that the trial court erred in failing to conduct a hearing on their postjudgment motion.